IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Philip Wilkinson and Pam Reed, individually and on behalf of a class or classes of all others similarly situated, | § § § § § | |
| Plaintiffs | § § | Cause No. _____ |
| v. | § § | |
| BDO USA, LLP and BDO International Ltd., | § § § § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      PARTIES ..................................................................................................................... 1

II.     PERSONAL JURISDICTION ....................................................................................... 3

III.    SUBJECT MATTER JURISDICTION & VENUE ......................................................... 5

IV.     FACTUAL BACKGROUND .......................................................................................... 6

        A.      The Stanford Financial Group Empire ................................................................. 6

        B.      Stanford Financial Group's Operations in the United States ................................ 7

        C.      The Anatomy of the Stanford Ponzi Scheme ...................................................... 10

                a.      Guardian International Bank and Stanford International Bank Ltd. ......... 11

                b.      Stanford Seizes Control of Antigua's Banking Regulators ..................... 12

                c.      Stanford Sells to Accredited Investors in the United States ................... 14

                d.      Stanford Breeds Loyalty Through Exorbitant Compensation ................. 15

                e.      Dissecting the Fraud ............................................................................. 16

                f.      Stanford's House of Cards Finally Collapses ......................................... 19

        D.      The Findings of this Court .................................................................................. 21

        E.      BDO's Knowing Participation in the Stanford Ponzi Scheme ............................ 22

                a.      BDO's Significant Role In Weakening Antigua's Banking Laws as a
                        Member of the Stanford Task Force ....................................................... 23

                b.      BDO Visits Stanford International Bank Ltd. and Ensures the Bank's
                        Compliance with Antigua's Newly Weakened Banking Laws................. 26

                c.      BDO Violates Its Independence Requirements Under GAAS ................. 26

                d.      BDO Actively Conceals Material Information ......................................... 27

                e.      BDO Fails to Confirm that Stanford Financial Group Remitted
                        Investor Funds to Purchase SIBL CDs .................................................. 28

                f.      BDO Fails to Properly Modify Its Audit Opinions................................. 29

                g.      BDO Fails to Properly Consider and Apply Consolidation Principles..... 30

h.      BDO Issues Unqualified Audit Opinions Despite its Stanford Clients' Substantial Dependence on an Unregulated, Fictitious Product............... 30

i.      Other Facts Showing BDO's Support of the Stanford Ponzi Scheme ...... 31

F.      BDO Failed in its Role as the Public Watchdog.................................................... 32

V.      PLAINTIFFS' AND CLASSES OF INVESTORS' CLAIMS......................................... 34

A.      Basis for Claims...................................................................................................... 34

B.      Class Action Allegations......................................................................................... 37

C.      Discovery Rule/Inquiry Notice ............................................................................... 39

VI.     CAUSES OF ACTION FOR PLAINTIFFS AND BOTH CLASSES ............................. 39

VII.    JOINT ENTERPRISE/SINGLE BUSINESS ENTERPRISE........................................... 50

VIII.   ALTER EGO .................................................................................................................... 51

IX.     RESPONDEAT SUPERIOR ........................................................................................... 52

X.      ACTUAL DAMAGES...................................................................................................... 53

XI.     PUNITIVE DAMAGES ................................................................................................... 53

XII.    ATTORNEYS FEES ........................................................................................................ 53

XIII.   CONDITIONS PRECEDENT .......................................................................................... 53

XIV.    JURY DEMAND.............................................................................................................. 54

XV.     PRAYER........................................................................................................................... 54

**PLAINTIFFS PHILIP WILKINSON and PAM REED, individually and on behalf of two separate classes of all others similarly situated**, file this Original Class Action Complaint (the "Complaint") against **DEFENDANTS BDO USA, LLP and BDO INTERNATIONAL LTD**.   The following allegations are based upon information and belief (such information and belief being based, in part, upon the investigation conducted by Plaintiffs' counsel), except those allegations that pertain to the named Plaintiffs and Plaintiffs' counsel, which are based upon personal knowledge.   The named Plaintiffs and Plaintiffs' counsel expressly reserve the right to supplement or amend this Complaint based upon Plaintiffs' counsel's ongoing investigation of the facts and circumstances concerning the allegations in this Complaint.  In support of this Complaint, the named Plaintiffs show the Court as follows:

## I.    PARTIES

1.      Plaintiff Philip Wilkinson is a citizen of the United States of America currently residing in Harris County, Texas.

2.      Plaintiff Pam Reed is a citizen of the United States of America currently residing in Travis County, Texas.

3.      Additionally, this case seeks certification of a class of all investors who, as of February 17, 2009, had purchased and still held Certificates of Deposit ("CDs") and/or otherwise maintained deposit accounts with Stanford International Bank Ltd.

4.      Additionally, if necessary, this case also seeks certification of a class of all investors who were clients or customers of Stanford Group Company, Stanford Trust Company (Louisiana), or Stanford Fiduciary Investor Services, and as of February 17, 2009, had purchased and still held CDs and/or otherwise maintained deposit accounts with Stanford International Bank Ltd.  (Collectively, these two classes are referred to as the "Classes").

5.      Defendant BDO USA, LLP ("BDO USA") is a Delaware limited liability partnership with its principal place of business in Chicago, Illinois.  Defendant may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.  Defendant may also be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 East 7th Street, Suite 620, Austin, Texas 78701.  Defendant may also be served by serving process on one of its partners, James Fielding, at 515 Congress Avenue, Suite 2600, Austin, Texas 78701.

6.      Defendant BDO International Ltd. ("BDO International ") is a worldwide network of public accounting firms, including but not limited to:  (i) BDO International Limited, a United Kingdom company limited by guarantee with its principal place of business in London, United Kingdom; (ii) BDO Global Coordination B.V., an entity incorporated under Netherlandish law with its statutory seat in Eindhoven, Netherlands and an office in Brussels, Belgium; (iii) Brussels Worldwide Services BVBA, a limited liability company incorporated in Belgium with its statutory seat in Brussels, Belgium; (iv) BDO USA, LLP, a Delaware limited liability partnership with its principal place of business in Chicago, Illinois; (v) BDO Ecuador, an accounting firm formed under Ecuadorian law with its principal place of business in Quito, Ecuador; (vi) BDO Castillo Miranda y Compañía, S.C. ("BDO Mexico"), an accounting firm formed under Mexican law with its principal place of business in Mexico City, Mexico; (vii) BDO Peru, an accounting firm formed under Peruvian law with its principal place of business in Lima, Peru; and (viii) BDO España ("BDO Spain"), a Spanish limited company formed under Spanish law with its principal place of business in Madrid, Spain.  (Collectively, these firms and any other member firms in BDO International's network of public accounting firms are referred

to as BDO International's "Member Firms".)  BDO International has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas.  BDO International may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965).  BDO International may be served at its home office address at 55 Baker St., W1U 7EU, London, United Kingdom.

7.     Collectively, BDO USA and BDO International are referred to as "BDO" in this Complaint.

## II.     PERSONAL JURISDICTION

8.     This Court has personal jurisdiction over non-resident BDO USA under the Texas Long Arm Statute.  BDO USA has conducted continuous and systematic business in the State of Texas for many years and is therefore subject to general jurisdiction.  Furthermore, as described herein, BDO USA has engaged in specific jurisdiction contacts with the State of Texas, specifically with Stanford Financial Group, including Stanford Group Company, headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore BDO USA has done business and committed torts, in part, in the State of Texas.

9.     Beginning in 1995, BDO USA provided audit, tax, and other professional services to the most important businesses of Stanford Financial Group, headquartered and controlled in Houston, Texas, including Stanford Group Company, Stanford Trust Company (Louisiana), Stanford Group Holdings, Stanford International Bank Ltd., Stanford Capital Management, LLC, and Stanford Coins & Bullion, Inc.  When providing such audit and other professional services to these Stanford Financial Group entities, BDO USA engaged in extensive contacts with Stanford Financial Group personnel based in Houston, Texas.  In conjunction with BDO USA's provision of such audit and other professional services to Stanford Financial Group, BDO USA

engaged in contacts with the State of Texas that assisted and perpetuated the Stanford Ponzi scheme described herein. BDO USA also maintains, and has maintained, offices in Texas. Based on its general and specific contacts with the State of Texas, BDO USA has purposefully availed itself of the privilege of conducting activities within Texas and has established minimum contacts with the State of Texas under the Texas Long Arm Statute.

10. Furthermore, BDO International, either directly or through its network of affiliated Member Firms and agents, has engaged in specific jurisdiction contacts with the State of Texas. Specifically, BDO International, directly and/or through its Member Firms, has engaged in specific jurisdiction contacts with Stanford Financial Group headquartered in Houston, Texas, these contacts give rise to Plaintiffs' causes of action, and therefore BDO International has done business and committed torts, in part, in the State of Texas. Beginning in 1995, BDO International, directly and/or through its Member Firms, provided audit, tax, consulting, and/or other services to Stanford Financial Group headquartered in Houston, Texas, and in that capacity, engaged in extensive contacts with Stanford Financial Group personnel based in Houston, Texas to provide such services. In providing such services to Stanford Financial Group, BDO International, acting directly and/or through its Member Firms, provided consulting or other professional services to Stanford International Bank Ltd., which was controlled by Stanford Financial Group in Houston, Texas, including certain services for the Stanford Task Force (defined and described later in this Complaint) and conducting an operational review of Stanford International Bank Ltd. BDO International, acting directly and/or through its Member Firms, also improperly issued unqualified audit opinions on the annual financial statements of various Stanford Financial Group companies, which were controlled by Stanford Financial Group in Houston, Texas, including the annual financial statements of

Stanford Group Company, Stanford Trust Company (Louisiana), Stanford Group Holdings, Stanford Capital Management, LLC, and Stanford Coins & Bullion, Inc.  BDO International, acting directly and/or through its Member Firms, also provided audit, tax, consulting, and/or other services to Stanford Financial Group companies in Ecuador, Mexico, Peru, and Spain, and such companies were controlled by Stanford Financial Group in Houston, Texas.  Based on its general and specific contacts with the State of Texas, BDO International, acting directly and/or through its Member Firms, has purposefully availed itself of the privilege of conducting activities within Texas and has established minimum contacts with the State of Texas under the Long Arm Statute.

### III.   SUBJECT MATTER JURISDICTION & VENUE

11.    This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.    This Court also has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a)(1)-(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different States, and (2) citizens of a State and citizens or subjects of a foreign state.  Plaintiffs are citizens of the State of Texas and Defendant is a citizen of the States of Delaware and Illinois.  Further, this case seeks certification of a class of all investors who purchased and still held CDs and/or otherwise maintained deposit accounts with Stanford International Bank Ltd. as of February 17, 2009, and many of these investors are citizens of foreign states, including but not limited to Colombia, Ecuador, Mexico, Panama, Peru, Venezuela, the United Kingdom, and Switzerland.

13.    This Court also has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(A) because this is a class action in which the amount in controversy exceeds

$5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of states different from Defendant.

## IV.   FACTUAL BACKGROUND

### A.   The Stanford Financial Group Empire

14.     From the mid 1980s through February 2009, R. Allen Stanford ("Stanford") — a former gym owner from Mexia, Texas — built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds.  The empire was comprised of over 140 companies from across the globe, all of which were ultimately owned by Stanford himself.  The companies operated under the brand name "Stanford Financial" with their worldwide headquarters located in Houston, Texas.  The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial Group") included: the Houston, Texas-based registered broker/dealer and investment adviser company Stanford Group Company ("SGC"); the Antiguan-based offshore bank Stanford International Bank Ltd. ("SIBL"); Stanford Trust Company (Louisiana) ("STC"); Stanford Trust Company (Antigua); and the representative offices of Stanford Trust Company (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS"), that operated in Miami, Houston and San Antonio.   Stanford Financial Group was controlled and managed principally from Houston, Texas in the United States.

15.     Stanford Financial Group's offshore banking operation began as Guardian International Bank in the mid 1980s.  Over the years, Stanford Financial Group grew into a full-service financial services firm, offering worldwide clients private banking and U.S.-based broker/dealer and investment adviser services.  Stanford Financial Group gave its clients all the appearances of a highly successful operation, with lavish offices in some of the world's premier

cities.  Stanford himself made the Forbes' list of the richest people in the world with a personal fortune estimated at $2.2 billion.

16.     The entire Stanford Financial Group operation was fueled by one primary product:  CDs issued by SIBL, the Antiguan offshore bank wholly owned and controlled by Stanford himself.  Clients who were introduced to the Stanford Financial Group, whether in Houston, Miami, Caracas, or Mexico City, quickly learned that the main financial product peddled by the group was the SIBL CD.  The SIBL CDs were sold worldwide by a web of different Stanford Financial Group promoter companies, including SGC, STC and SFIS, whose sole function was to promote the sale of SIBL CDs.  For example, to access additional investor capital in Latin America, Stanford Financial Group established representative offices in Colombia (Stanford Group Columbia a/k/a Stanford Bolsa y Banca), Ecuador (Stanford Group Ecuador a/k/a Stanford Group Casa de Valores, S.A. and Stanford Trust Company Administradora de Fondos y Fideicomisos, S.A.), Mexico (Stanford Group Mexico a/k/a Stanford Group Mexico S.A. de C.V. and Stanford Fondos), Panama (Stanford Group Panama a/k/a Stanford Bank Panama and Stanford Casa de Valores Panama), Peru (Stanford Group Peru a/k/a Stanford Group Peru S.A. Sociedad Agente de Bolsa), and Venezuela (Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A., Stanford Bank Venezuela, and Stanford Group Venezuela Asesores de Inversion).  These foreign offices were ultimately controlled by Stanford Financial Group's entities and employees in Houston, Texas.  By 2009, SIBL's vast network of domestic and foreign offices had sold over $7.2 billion in CDs.

**B.      Stanford Financial Group's Operations in the United States**

17.     For the first decade of its CD sales operations, 1985 to 1995, Stanford Financial Group and its offshore bank (whether Guardian International Bank or SIBL) targeted a Latin American clientele.  But by the mid 1990s, Stanford Financial Group had begun to establish a

foothold in the United States.  In 1995, Stanford Financial Group established SGC, a Texas corporation, and in February 1996, SGC was registered as a broker/dealer and investment adviser.  SGC established offices initially in Houston and Baton Rouge.  Stanford Financial Group began the practice of "head hunting" for U.S. brokers, bankers, and other financial advisers, paying enormous signing bonuses to the brokers, bankers and other financial advisers to leave their jobs at other firms and transfer their book of clients over to SGC.  Fueled by this influx of veteran bankers, brokers and investment advisers, SGC grew from 6 branch offices in the United States in 2004 to 33 offices across the United States in 2009.

18.     Early on, Stanford Financial Group recognized the huge potential for marketing its offshore CDs to Latin Americans via the "gateway" city of Miami.  In 1998, Stanford Financial Group established SFIS, a representative office of SIBL in Miami, and disguised SFIS as the representative office of Stanford Trust Company (Antigua) in order to evade U.S. banking regulations.  The Miami office of SFIS generated over $1 billion in SIBL CD sales for Stanford Financial Group, primarily from sales to investors from South American countries such as Colombia, Ecuador, Peru, and Venezuela.  Stanford Financial Group also set up SFIS offices in Houston and San Antonio, Texas to cater to Mexican investors visiting those cities and bring in more investment money to feed the ever expanding Ponzi scheme.

19.     To increase sales of its SIBL CDs, Stanford Financial Group determined that it could convert U.S. investors' IRA funds to the SIBL CDs.  STC was therefore established in Baton Rouge, Louisiana in 1998 to serve as the trustee/custodian for IRA accounts owned by investors referred to STC by SGC — a service that traditional IRA custodians would *not* provide.  After STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some or, in most cases, ***all*** of their IRA accounts into the SIBL CDs.

20.     For all of the Stanford promoter companies — whether SGC, SFIS, or STC — the primary product marketed and sold was the SIBL CD, as it sustained Stanford Financial Group's operations and paid the employees' exorbitant salaries and bonuses.  The promoter companies were all members of Stanford Financial Group, were ultimately owned by Stanford himself, were interconnected via intercompany marketing and referral fee agreements, and were controlled by Stanford Financial Group in Houston, *Texas*.

21.     Houston, Texas was the nerve center and principal base for all of Stanford Financial Group's operations, including SIBL, SGC, SFIS, and STC.  STC was wholly owned and controlled by Houston-based SGC, and virtually every member of the STC Board of Directors at any time was an employee of SGC.  SGC directed the operations of STC and provided all administrative functions from Houston.  STC's annual budget and financial forecasts were prepared by SGC in Houston, and even reimbursement of expenses for STC employees was handled by Stanford Financial Group's corporate accounting team in Houston.

22.     All the sales and marketing practices for the entire Stanford Financial Group (including SIBL), as well as general operational and administrative functions, were managed under the overall direction, supervision, and control of the Houston offices.  SIBL itself never had a marketing or sales arm in Antigua.  Stanford Financial Group used entities like SGC, SFIS, and STC to continue selling SIBL CDs and bring in new money to feed the Ponzi beast.

23.     The head of Stanford Financial Group's global sales operation for the marketing and sale of SIBL CDs was located in Houston, Texas.  All the sales practices, directives, techniques, strategies and reward programs for Stanford Financial Group, including SIBL, were developed and crafted in Houston and disseminated to the various Stanford Financial Group branch offices around the world.  All the sales force training manuals, promotional literature, and

materials for SIBL, including the Spanish-language promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial Group sales offices around the world to be utilized by the local sales force in each country.

24.     In addition, mandatory sales training for the Stanford Financial Group sales force for SIBL was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by Stanford Financial Group personnel.   In those mandatory training sessions, sometimes twice a year, Stanford Financial Group's financial advisers ("FAs") were trained to sell the image of Stanford Financial Group.  The "script" for why SIBL was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled into their heads again and again.

**C.     The Anatomy of the Stanford Ponzi Scheme**

25.     The reality of Stanford Financial Group's empire was that it was nothing but a massive, worldwide Ponzi scheme.  Stanford Financial Group violated the laws of virtually every country it operated in, including the United States, Ecuador, Mexico, Venezuela, and Antigua. Stanford's repeated commission of regulatory fraud in various countries enabled and fostered the growth of SIBL's CD sales.

26.     The gist of the fraud was actually quite simple:  (1) sell the offshore SIBL CDs through a flashy marketing campaign designed to trick investors into believing they were purchasing safe, secure (even insured) and liquid CDs that were regulated in the United States because SGC was a U.S. licensed broker/dealer; while at the same time (2) maintaining a "Wizard of Oz" veil of secrecy over the SIBL asset portfolio and what Stanford was doing with the CD investors' money (which ended up being whatever Allen Stanford wanted).   Thus

Stanford and Stanford Financial Group went to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's operations.

27.     SIBL was actually insolvent (i.e., its liabilities exceeded the fair value of its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the bitter end.  Stanford induced investors to buy CDs by offering above-market rates, issuing financial statements and other data that significantly overstated SIBL's earnings and assets, and misrepresenting its business model, investment strategy, financial strength, safety and nature of its investments, and other facts important to investors.  In reality, SIBL's earnings and assets were insufficient to meet its CD-payment obligations, so the only way Stanford Financial Group could keep the scheme going was by using proceeds from new CD sales to pay redemptions, interest, and operating expenses.  SIBL's assets were inflated to offset CD obligations and its revenues were "reverse-engineered" to arrive at desired levels.  Each year or quarterly reporting period, Stanford Financial Group would simply determine what level of fictitious revenue SIBL "needed" to report in order to both look good to investors and regulators and purport to cover its CD obligations and other expenses.  Stanford Financial Group would then back into the necessary revenue amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

### a.     Guardian International Bank and Stanford International Bank Ltd.

28.     Stanford opened his first offshore bank, Guardian International Bank ("Guardian Bank"), in 1985 on the tiny Caribbean island of Montserrat (12,000 residents).  The following year, Stanford established Guardian Bank's representative offices in Miami, Florida and Houston, Texas under the name of Guardian International Investment Services ("Guardian Services"), which was designed to cater to wealthy Latin American clients.  Stanford brought in

his old college roommate, James Davis, to help run operations. The Guardian Bank and Guardian Services model was an early blueprint for what later became the Stanford Financial Group empire. Guardian Bank offered CDs with rates typically 2% to 3% above the average rates available in the market, all with the confidentiality associated with offshore private banking.

29.     By 1989, the banking system in Montserrat came under investigation by British and U.S. authorities. Consequently, Guardian Bank itself came under scrutiny for possible drug money laundering, so Stanford looked to move his bank to a new location. In December 1990, Stanford re-incorporated Guardian Bank in Antigua and transferred all the assets of his Montserrat-licensed bank to the new Antiguan-licensed Guardian Bank. By May 1991, Stanford's banking license was officially revoked by the Montserrat Government (although in 1994 Stanford sued the Government of Montserrat to have that order rescinded). In effect, Stanford simply picked up his banking operations and moved them to Antigua, and continued the same basic business plan that had proven so profitable for Stanford in Montserrat. Stanford eventually changed the name of his Antiguan bank from Guardian Bank to Stanford International Bank Ltd. in 1994.

### b.      Stanford Seizes Control of Antigua's Banking Regulators

30.     Once established in Antigua, Stanford quickly set about establishing a symbiotic relationship with the local government. Stanford quickly became the island's largest private-sector employer and even bought the Antiguan newspaper, the Antiguan Sun. Additionally, in return for political cover, Stanford eventually became a *major* source of funding for the *entire* island, eventually loaning hundreds of millions of SIBL CD investors' dollars to the Antiguan government. By 2004, the island's government owed Stanford Financial Group over $87 million

— nearly half its annual tax revenues — with certain loans secured by the government's tax revenues and medical fund.

31.     In fact, the Antiguan government's relationship with Stanford was so incestuous that Stanford himself actually *rewrote* Antigua's banking laws.  In 1996, Antigua began to suffer from the same suspicions that doomed Stanford's operations in Montserrat, so Stanford approached the Antiguan government about these emerging new threats to SIBL's operations in Antigua.  In June 1997, the Antiguan government formed the Antiguan Offshore Financial Sector Planning Committee, *appointing Stanford as chairman*, to advise the government and recommend changes to its banking laws.  Stanford then leveraged his new committee to *fund*, *organize*, and *appoint his agents* — including **several of BDO's partners** — to a banking task force that was charged with amending Antigua's banking laws and supervising Antigua's banks. In January 1998, Stanford's new task force (the "Stanford Task Force") recommended sweeping changes to Antigua's banking laws and regulatory institutions.  The Antiguan government later adopted these recommendations, which included highly suspicious amendments to the nation's Money Laundering (Prevention) Act.  Stanford also used his new Task Force, a precursor to Antigua's Financial Services Regulatory Commission ("FSRC"), to wrest control of Antigua's entire offshore banking industry, even stooping to the level of physically seizing bank records from the previous Antiguan banking regulators.

32.     Antigua's corruption and lax banking regulations are borne out by the Plea Agreement entered by Stanford CFO Jim Davis (the "Davis Plea"), as well as by the June 18, 2009 federal grand jury indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and former head of Antigua's FSRC (the "Indictment").  The Davis Plea and Indictment allege that for years, King — while acting as the

CEO of the Antiguan FSRC — accepted bribes from Stanford and/or his associates in return for his assurance that the FSRC "looked the other way" and would not properly perform its regulatory functions or supervise SIBL.  In 2003, King even entered into a bizarre Voodoo-like "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford.  As part of this blood-brother relationship and bribery, King became Stanford's regulatory spy and "inside man" in terms of relaying information to Stanford concerning the SEC's investigations of Stanford Financial Group and SIBL from 2005 all the way until 2009. All this was just part and parcel of Stanford's broader conspiracy to keep his Ponzi scheme alive by evading and obstructing regulation of SIBL's activities at every turn and in every country.

### c.      Stanford Sells to Accredited Investors in the United States

33.      In November 1998, Stanford Financial Group needed new capital to feed its Ponzi scheme, so SIBL filed a Regulation D exemption with the United States Securities and Exchange Commission ("SEC").  Stanford Financial Group used this exemption to sell SIBL CDs to U.S. "accredited investors" in the United States without registering them as securities.  SIBL's initial Reg. D filing listed CD offerings totaling only $50 million.

34.      After the initial Reg. D filing in 1998, Stanford Financial Group began to exploit U.S. investors and its empire grew exponentially.  SIBL filed an amended Reg. D in November 2001 to increase the CD offering amount to $150 million.  SIBL filed two additional amendments in 2004 (March and then November) increasing the size of SIBL's offering to $200 million and then to $1 *billion*, clearly evidencing the mass sales of SIBL CDs taking place in the United States.  Finally, in November 2007, SIBL filed yet another Reg. D amendment to increase the size of the offering to *$2 billion*.  During those years, Stanford Financial Group sold CDs under the Reg. D offering to well in excess of 1,000 investors.

35.     By 2003, Stanford Financial Group had printed and distributed to its FAs some 30,000 offering brochures for SIBL CDs.  In 2005, Stanford Financial Group began an intensive television advertising campaign in the United States designed to promote the sale of SIBL CDs. By March 2006, Stanford Financial Group had distributed 4,424 SIBL CD "Accredited Investor" subscription agreements to investors under the Reg. D offering.

### d.     Stanford Breeds Loyalty Through Exorbitant Compensation

36.     From 2004 to 2008, Stanford Financial Group grew into a high-powered sales and marketing juggernaut.  The different Stanford Financial Group sales offices competed with each other for SIBL CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars".  In order to market and sell the SIBL CDs, Stanford Financial Group established a commission structure that provided huge incentives for the Stanford Financial Group FAs, including those at SGC, to sell as many SIBL CDs as possible. The FAs became addicted to these outrageous commissions — which they referred to as "bank crack" — and the FAs became more and more aggressive in pushing the SIBL CDs on innocent investors like Plaintiffs, despite the high-risk nature of the investments.  Specifically, SIBL paid disproportionately large commissions to SGC for the sale of its CDs:  SGC received a 3% commission upon each sale of a SIBL CD, with 1% going to the SGC broker that made the sale, and the FAs were eligible to receive an additional 1% trailing commission throughout the term of the CD.  Stanford Financial Group used this generous commission structure to recruit established financial advisers, and to reward those advisers for aggressively selling the SIBL CDs to investors.  Of course, commission and bonus structures like that used by SIBL are not typical, largely because they cannot be sustained economically.

e.      **Dissecting the Fraud**

37.      The ultimate reality of Stanford Financial Group is that it was, *at all times*, a Ponzi scheme based out of Houston, Texas.  In essence, Stanford Financial Group, acting through its international network of companies, lured money from investors like Plaintiffs; sold them fictitious "Certificates of Deposit;" and then pooled all the investors' money together to fund Allen Stanford's lavish lifestyle and invest in various illiquid and high-risk assets worldwide, including personal loans to Allen Stanford and speculative investments in Antiguan real estate.  None of the investors' money was segregated.  Instead, all investor money was commingled and then sprinkled as private equity investments throughout the various companies that comprised Stanford Financial Group.  As such, Stanford Financial Group was violating the Investment Company Act by operating as an unregistered outlaw hedge fund and selling its internal securities product to Plaintiffs and others from Houston, Texas.  Additionally, Section 47(b) of the Investment Company Act provides:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.  15 U.S.C. § 80a-46.

38.      Stanford Financial Group was never registered nor authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or members of either Class, who were consistently and uniformly told verbally and via the Stanford Financial Group promotional materials that, e.g., the Stanford Financial Group based in Houston, Texas was compliant, authorized, and regulated by the SEC and Financial Industry Regulatory Authority ("FINRA"), and backed by insurance coverage from the Securities Investor Protection

Corporation ("SIPC") and Lloyd's of London.  Plaintiffs and other investors were never told the material fact that the acts of Stanford Financial Group and its unregistered investment company were *void as a matter of law* under Section 47 of the Investment Company Act.

39.     As part of the fraud committed on Plaintiffs and members of both Classes, Stanford Financial Group also uniformly touted the high liquidity of SIBL's investment portfolio.  For example, in its marketing materials distributed to Plaintiffs and members of both Classes from at least 1995 through 2009, Stanford Financial Group emphasized the importance of the SIBL CD's liquidity, stating (under the heading "Depositor Security") that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors." *None of that was true.*  Likewise, Stanford Financial Group trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that the "liquidity/marketability of SIBL's invested assets" was the "most important factor to provide security to SIBL clients . . . ."  To ensure investors would buy the SIBL CDs, Stanford Financial Group, through its FAs, assured the investor clients that SIBL's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice.  But in fact, nearly all of SIBL's investments were concentrated in high-risk, illiquid ventures:  (1) unsecured personal loans to Allen Stanford in the amount of $1.8 billion; (2) private equity investments in non-public companies; and (3) private investments in Stanford Financial Group companies with real estate holdings, including extensive real estate holdings in Antigua and elsewhere in the Caribbean.

40.     Contrary to Stanford Financial Group's representations (both verbal and via the promotional materials) to Plaintiffs and members of both Classes regarding the liquidity of its portfolio from 1995 through 2009, significant portions of SIBL's portfolio were misappropriated

by SIBL's sole shareholder, Allen Stanford, to fund his lavish lifestyle and invest heavily in Caribbean real estate development ventures. In fact, by 2008, Stanford Financial Group was essentially a real estate development fund, a crucial fact that was never disclosed to Plaintiffs or members of either Class.

41.      At the end of 2008, Stanford could account for only a fraction of the SIBL CD obligations. The largest segments of SIBL's portfolio consisted of "loans" to Stanford and over-valued real estate, primarily in the Caribbean. By February 2009, Stanford Financial Group had misappropriated at least $1.8 billion of investor money through bogus personal loans to Stanford and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses, including massive investments in real estate and other private business ventures in Antigua. The rest of the CD investors' money was spent by Stanford Financial Group on creating and perpetuating the charade of Stanford Financial Group's image, with lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial Group image of wealth, power, and prestige. None of this was disclosed to Plaintiffs or members of either Class.

42.      As alleged in the Davis Plea and in the criminal indictment of Allen Stanford and his associates, Stanford and his CFO Jim Davis fabricated the performance of SIBL's investment portfolio and lied to investors about the nature and performance of that portfolio. Gilberto Lopez and Mark Kuhrt, accountants for Stanford Financial Group companies, fabricated the financial statements. Using a pre-determined return on investment, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that SIBL did not actually earn. Information in SIBL's financial statements and annual

reports to investors about the bank's investment portfolio bore *no* relationship to the actual performance of the bank's investments.  SIBL's financial statements and annual reports to investors were prepared, drafted, and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis then signed these falsified financial statements.

43.     By the end of 2008, Stanford Financial Group had sold approximately $7.2 billion worth of SIBL CDs to Plaintiffs and other CD investors by touting:  (i) the bank's safety and security, including that invested funds were insured; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that exceeded those offered by commercial banks in the United States.  It was at this time in 2008, in the midst of the worldwide financial meltdown, that Stanford Financial Group began to crumble.

### f.     Stanford's House of Cards Finally Collapses

44.     As alleged by the SEC and the United States Justice Department, Stanford and Davis — attempting to cover a hole in SIBL's balance sheet that would cause it to fall below minimum capital requirements — concocted a bogus $541 million shareholder equity infusion by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of Antiguan property he purchased for $63 million, transferred it to some entities who "booked" it at $3.2 billion, and then transferred shares in those entities back to SIBL.

45.     In October 2008, Stanford Financial Group began suffering liquidity problems caused by a depositor "run" on SIBL that prevented SIBL from complying with client requests for funds transfers.  SIBL's CD transaction records indicate that approximately $2 billion in CDs were redeemed from January 1, 2008 through February 17, 2009.  These redemptions and volatile financial markets had a huge impact on the ability of Stanford Financial Group's FAs to keep clients pacified, and on Stanford Financial Group's ability to keep the Ponzi scheme afloat.

As a result, the FAs were ordered to continue selling the CDs to bring in new money and to discourage redemptions.

46.     In the wake of the Madoff scandal in January 2009, Venezuelan financial analyst Alex Dalmady, as a favor for a friend, performed an analysis of SIBL's returns over the years, taken from SIBL's *publicly available* Annual Reports, and then published his findings in a Venezuelan magazine under the title "Duck Tales."   His findings were then re-published in various blog postings.   Dalmady concluded that Stanford Financial Group was nothing but another Ponzi scheme — a Ponzi "duck".  The duck (or rather the cat) was out of the bag.

47.     In the background stood an increasingly skeptical SEC, which had been investigating Stanford Financial Group for four years.  The Madoff scandal renewed the intensity of the SEC's expanding investigation.  On February 4, 2009, in advance of a deposition before the SEC, Stanford Financial Group officials met with outside counsel in Miami.  Two days later, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Stanford an email, copying David Nanes, that illuminated Stanford Financial Group's crumbling empire:

> [T]hings are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means.  There are real bullets out there with my name on [sic], David's name and many others and they are very real…[w]e are all in this together.

48.     On February 17, 2009, the SEC filed a Complaint against SGC, SIBL, and other entities, as well as against Allen Stanford and Jim Davis, in the U.S. District Court for the Northern District of Texas.  The SEC obtained an injunction to freeze the assets of Stanford Financial Group and Ralph S. Janvey was appointed to serve as Receiver to liquidate the Stanford Financial Group of companies.  On June 18, 2009, Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts, including wire and mail fraud, obstruction of an SEC investigation, and money

laundering.  In August 2009, former Stanford Financial Group CFO Jim Davis pleaded guilty to, *inter alia*, securities fraud.

**D.**     **The Findings of this Court**

49.     This Court has already found that the Stanford fraud was a Ponzi scheme.  *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."); *id.* at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."); *id.* at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").

50.     In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings that the Stanford fraud was a Ponzi scheme.  *See Janvey v. Alguire*, 628 F.3d 164, 175 (5th Cir. 2010) (upholding this Court's Order).  In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> *          *          *
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme ab initio.
>
> *          *          *
>
> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .
>
> *          *          *

> Here, the Receiver provided evidence of a massive Ponzi scheme .
> . . .   The record supports the fact that Stanford, when it entered
> receivership, was grossly undercapitalized.

*Id.* at *9-13.

**E.     BDO's Knowing Participation in the Stanford Ponzi Scheme**

51.     BDO provided critical services to Stanford Financial Group for over a decade. For example, BDO audited the annual financial statements of SGC, the Texas-based broker/dealer and investment advisor that recommended and sold SIBL's fictitious CDs to investors.  All roads led to SGC, which was the nucleus for Stanford Financial Group's entire scheme.  BDO also audited the annual financial statements of STC, which served as custodian and held the fictitious CDs that SGC sold for its investors' IRA accounts.  In addition, BDO audited the annual financial statements of Stanford Group Holdings ("SGH"), a holding company for the broker/dealer arm of Stanford Financial Group, including SGC and STC. Notably, BDO also provided other *critical* services to SIBL, the unregulated, offshore bank that purportedly issued the fictitional paper.  (Collectively, these clients and BDO's other Stanford Financial Group clients, including but not limited to Stanford Capital Management, LLC and Stanford Coins & Bullion, Inc., are referred to as BDO's "Stanford Clients").

52.     Despite the pervasive fraud that infected Stanford Financial Group's operations, BDO repeatedly issued unqualified audit opinions on its Stanford Clients' annual financial statements.  BDO's audit opinions on SGC's financial statements were critical to Stanford Financial Group's success.  SGC was registered with the SEC and numerous state regulators as a broker-dealer and investment advisor, so SGC *needed* BDO's unqualified audit opinions to satisfy securities regulators and to continue recommending and brokering the sale of SIBL CDs. SGC was also a member of the National Association of Securities Dealers, Inc. (NASD), and was registered with the National Futures Association (NFA) and the Commodity Futures Trading

Commission (CFTC) as an introducing broker.  As BDO's own Independent Auditor's Reports acknowledge, SGC filed its BDO-audited annual financial statements with the SEC pursuant to Rule 17a-5 of the Securities Exchange Act of 1934 and Section 1.16 of the Commodity Exchange Act.

### a.   BDO's Significant Role In Weakening Antigua's Banking Laws as a Member of the Stanford Task Force

53.   BDO's unqualified audit opinions on SGC's annual financial statements were a critical link in the Ponzi scheme's chain, but the most *telling* of BDO's services trace back to SIBL's infancy in Antigua.  As discussed above, when Antigua began to suffer increasing scrutiny from foreign regulators, Stanford funded and organized the Stanford Task Force to rewrite Antigua's banking laws and seize control of its banking regulators.  The Task Force not only succeeded in weakening Antigua's regulatory regime, it strengthened SIBL's footing in Antigua by effectively eliminating SIBL's Antiguan competitors.  More importantly, the Task Force succeeded in making Allen Stanford Antigua's de facto offshore banking regulator, securing a safe haven for the Stanford Ponzi scheme's exponential growth in the years to come.

54.   The smashing success of the Stanford Task Force and its misleading regulatory "reforms" was rooted in its exclusive nine-person membership.  Every firm represented on the Task Force provided crucial services to Stanford Financial Group, and every individual member of the Task Force was personally appointed by Stanford himself, ***including three BDO partners***: (i) Jeffrey G. Balmer, a partner in BDO's West Palm Beach, Florida office and Co-Chair of BDO's Florida Practice Financial Services Industry Group; (ii) Keith Ellenburg, an *audit* partner in BDO's Miami, Florida office and member of BDO's Financial Institutions Industry Group; and (iii) Barry E. Hersch, another *audit* partner in BDO's Miami, Florida office and partner-in-charge of BDO's financial institution clients with domestic and international operations.

Additionally, Michael Ancona, a Managing Senior Associate in BDO's New York City office and member of BDO's Financial Institutions Consulting Group, also served on the Stanford Task Force.  In total, BDO's partners and associates comprised nearly *half* of the Stanford Task Force's members — more than any other firm represented on the Task Force — and BDO played a crucial role in helping Stanford Financial Group accomplish its goals.

55.    A key initiative for the Stanford Task Force — fully known to BDO — was to amend Antigua's Money Laundering (Prevention) Act to ensure that *"fraud"* and *"false accounting"* did *not* fall under the Act's prescribed list of violations.  BDO was charged with some of the most important responsibilities to complete this initiative, including reviewing and advising on Antigua's banking laws, and making recommendations to Antigua's regulatory authorities, including procedures for supervising and examining international banks.  BDO's responsibilities also included working jointly with Antigua's Special Advisor to the Prime Minister to:  (1) develop an organizational structure for Antigua's regulatory agency; (2) draft regulations and procedures for Antigua's banks; (3) draft procedural manuals and training programs for the Antiguan government and banking personnel; (4) develop an inspection program for Antigua's Minister of Finance; and (5) draft policies and procedures for Antigua's supervision of offshore banks.

56.    The results produced by Stanford's Task Force — and BDO's crucial role in achieving those results — is evidenced by the U.S. government's prompt response to Antigua's new banking laws.  In April 1999, shortly after Antigua amended its banking laws to incorporate the Task Force's recommendations, the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") issued an Advisory (the "Advisory") to warn banks and other financial institutions that banking transactions involving Antigua should be given enhanced

scrutiny because the Antiguan government had *significantly weakened* its banking laws and regulatory agencies.   The nearly unprecedented Advisory, which was only the second notice of its kind ever issued by the U.S. government, also warned that the Antiguan government had vested supervisory authority over its offshore financial services sector to a new regulatory agency, the International Financial Sector Authority ("IFSA"), that was rife with conflicts of interest because its "board of directors includes representatives of the very institutions the Authority is supposed to regulate."   According to the Advisory, this "rais[ed] serious concerns that those representatives are in fact in control of the IFSA, so that the IFSA is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards."   The Advisory continued,

> The amendment of the Money Laundering (Prevention) Act, combined with changes in [Antigua's] treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in [Antigua].   These changes threaten to create a 'haven' whose existence will undermine international efforts of the United States and other nations to counter money laundering and other criminal activity, a concern of which the United States has repeatedly made the government of [Antigua] aware.   The actions taken by the government of [Antigua] that weaken that nation's anti-money laundering laws and oversight of its financial institutions necessarily raise questions about the purposes of transactions routed into or out of [Antigua] or involving entities organized or domiciled . . . in [Antigua].

57.     The brazen conflicts of interest that permeated Antigua's new IFSA were similar to the conflicts suffered by BDO and the other members of Stanford's Task Force.   In fact, BDO's service on the Task Force completely undermined BDO's independence from Stanford Financial Group, and as a result, BDO blatantly violated Generally Accepted Auditing Standards ("GAAS") by issuing unqualified audit opinions on its Stanford Clients' annual financial statements during the years that BDO served on the Stanford Task Force.

      **b.**    **BDO Visits Stanford International Bank Ltd. and Ensures the Bank's Compliance with Antigua's Newly Weakened Banking Laws**

58.    At the same time that BDO's partners served on the Task Force, BDO also traveled to Antigua and performed a Policies and Procedures Review of SIBL's operations at Stanford's personal request. BDO's review included meetings with a number of SIBL's bank personnel during the two-week stay in Antigua. To complete the circle for SIBL and its work on Stanford's Task Force, BDO also provided consulting services to Stanford Financial Group in 1999, at Stanford's personal request, to develop examination programs that *ensured* SIBL's compliance with the new Antiguan laws and regulations that BDO had just weakened.

59.    As a result of BDO's participation on the Stanford Task Force, its formal review of SIBL's operations, and its consulting services for SIBL, BDO was acutely aware of Stanford Financial Group's improper activities. Nevertheless, BDO assisted its Stanford Clients in the face of a perceived risk that its assistance would facilitate Stanford Financial Group's violations of the Texas Securities Act. Furthermore, BDO's services demonstrate that BDO was aware of Stanford Financial Group's breaches of fiduciary duties to Plaintiffs and both Classes of CD investors, and that BDO was aware of its participation in those breaches of fiduciary duties.

      **c.**    **BDO Violates Its Independence Requirements Under GAAS**

60.    BDO's numerous audit failures are equally alarming. First, as noted above, BDO was *not* independent from Stanford Financial Group in 1997 and 1998 as a result of its participation on the Stanford Task Force. Therefore, BDO was prohibited from issuing an audit opinion on any Stanford Client's annual financial statements during that time. Under GAAS, an auditor *cannot* accept an audit engagement or issue an audit opinion on its client's financial statements unless it is independent of its client at all times. This mandate requires an auditor to avoid any relationship with a client that would cause an informed public to doubt the auditor's

independence, and requires the auditor to conduct itself in such a manner that an informed public would have *no* reason to doubt its independence.

61.     BDO violated this independence mandate by issuing audit opinions on SGC's annual financial statements at the same time that it served on the Stanford Task Force because: (1) the Task Force was funded, organized, and appointed by Stanford Financial Group's sole owner, Allen Stanford, to purposefully weaken the regulatory regime governing Stanford Financial Group's lone product, the SIBL CD; and (2) the very basis for SGC's existence, purpose, and operations as a broker/dealer and investment adviser was to sell as many SIBL CDs as possible, and the very basis for STC's existence, purpose, and operations as a trustee and custodian was to hold as many SIBL CDs as possible in the IRA accounts of Stanford Financial Group's innocent CD investors.  BDO's service on the Stanford Task Force, its failure to follow professional standards of independence, and its blatant disregard of its conflicts of interest enabled Stanford Financial Group to sell over $1 billion in unregulated, fictitious SIBL CDs to SGC's clients.  Under these circumstances, BDO's conduct demonstrates its complicity in the Stanford Ponzi scheme.

### d.     BDO Actively Conceals Material Information

62.     From at least February 2007 forward, BDO's audit engagement partner, Carlos Ancira, concealed critical, material information from his *own audit engagement team* for SGC's benefit.  Ancira knew that SGC was under increasing scrutiny from the SEC years before the U.S. government seized Stanford Financial Group in February 2009.  Shockingly, however, Ancira reassured SGC that "[d]ue to the sensitivity of the situation," no other members of BDO's audit engagement team would be told about the SEC's investigation of SGC for possible securities fraud.  Furthermore, Ancira permitted SGC's outside legal counsel to omit any discussion of the SEC investigation in its audit response letter.  Under Statement on Auditing

Standards No. 99 ("SAS 99"), which was partly issued in response to the Enron, WorldCom, and Adelphia scandals, auditors *must* consider potential fraud when auditing a client's financial statements.  In this case, the SEC's investigation of SGC triggered heightened scrutiny under SAS 99, and BDO was required to either:  (1) adjust the scope of its audits to address a heightened risk of fraud at SGC and expand the scope of its audit testing and analysis of internal controls; or (2) *possibly resign from the engagement*.  Instead, BDO consciously ignored SAS 99 and actively concealed material information from its own audit team "[d]ue to the sensitivity of the situation."

63.     Additionally, BDO helped Stanford Financial Group further conceal this investigation by permitting SGC to omit any disclosure of that investigation in its annual financial statements.  From at least February 2007 forward, BDO *knew* what Stanford Financial Group's customers did not:  the SEC was investigating SGC for very serious allegations of securities fraud.  Yet SGC's 2007 annual financial statements falsely disclose that SGC was merely responding to a "routine compliance and operational audit" conducted by the SEC.  This disclosure is patently false.  It does not inform financial statement users that the SEC is investigating SGC for possible securities fraud.  If the SEC's investigation was sufficiently material for BDO to conceal that investigation from its own audit team, then certainly it was sufficiently material to require disclosure in SGC's annual financial statements in accordance with applicable securities laws and Generally Accepted Accounting Principles ("GAAP").

### e.     BDO Fails to Confirm that Stanford Financial Group Remitted Investor Funds to Purchase SIBL CDs

64.     For every year that BDO audited SGC's annual financial statements, BDO further failed to properly track SGC's client funds to confirm that those funds were in fact remitted to SIBL for the purpose of purchasing SIBL CDs.  According to the Receiver's forensic accountant,

Karyl Van Tassel, "SGC customer funds sent by wire transfer and intended to purchase SIBL CDs did *not* go to [SIBL] in Antigua," but instead were "managed by [Stanford Financial Group Company] personnel in the U.S." and then "disbursed by [such] personnel among [Stanford Financial Group entities], including SGC."  Under GAAS rules governing due professional care, internal controls, and competent evidentiary matter, among others, BDO was duty bound to track investor funds obtained by SGC, as the broker/dealer for the SIBL CDs, and confirm that investor funds intended to purchase SIBL CDs were in fact transferred to SIBL for that purpose. If BDO met its burden under GAAS to track such funds, then it *knew* the funds never made it to SIBL, and therefore *knew* the funds were not used to purchase any SIBL CDs.  On the other hand, if BDO failed to meet its burden under GAAS and disregarded its obligation to track such investor funds, then BDO's conduct constitutes a major audit failure.

### f.   BDO Fails to Properly Modify Its Audit Opinions

65.    For every year that BDO audited the annual financial statements of any Stanford Client, BDO continued to issue unqualified audit opinions even though its domestic Stanford Clients almost *never* made any money.  In 2007 — the last year that audited financial statements are available — SGH and SGC sustained annual net operating *losses* of approximately $30 million and $27 million, respectively, and both companies suffered from an accumulated *deficit* of approximately $77 million.  Stanford Capital Management, LLC and Stanford Coins & Bullion, Inc. also suffered from accumulated deficits.

66.    BDO knew that Stanford had to personally fund millions of dollars in routine capital infusions to keep these companies afloat.  Despite these facts, however, BDO *never* sought to verify Stanford's personal assets or income, *never* verified the assets or income of SIBL (the apparent source of Stanford's supposed wealth), and *never* verified that Stanford was contractually obligated to continue funding these companies.  Under SAS 59, BDO had to

consider its Stanford Clients' ability to continue operations as going concerns, and without any assurance that Stanford had the means and obligations to continue funding these companies, BDO was required under SAS 59 to modify its opinions and disclose that there was substantial doubt about the ability of its Stanford Clients to continue as going concerns.  Instead, BDO repeatedly issued unqualified audit opinions without any such disclosure, evidencing yet another major audit failure that materially and significantly aided the Stanford Ponzi Scheme.

g.     **BDO Fails to Properly Consider and Apply Consolidation Principles**

67.     BDO also failed to properly consider and apply GAAP guidance governing consolidation for its Stanford Clients' 2003 through 2007 annual financial statements.  Under Financial Accounting Standards Board ("FASB") Interpretation Nos. 46 and 46R ("FIN 46"), BDO was required to understand Stanford Financial Group's overall business model and the relationships between its affiliated entities.  The FASB issued FIN 46 in the wake of the Enron scandal to require auditors to understand the "big picture" by considering the substance of relationships among related business entities to determine consolidation for financial reporting purposes.  If BDO properly considered and applied FIN 46 when auditing its Stanford Clients, particularly SGC and STC, then BDO *knew* that Stanford Financial Group operated as a single business enterprise whose sole purpose was to sell unregulated, fictitious securities.  If, on the other hand, BDO utterly failed to consider and apply FIN 46 when auditing its Stanford Clients, then BDO's willful conduct constitutes another major audit failure.

h.     **BDO Issues Unqualified Audit Opinions Despite its Stanford Clients' Substantial Dependence on an Unregulated, Fictitious Product**

68.     Despite its institutional knowledge of the Stanford Task Force and SIBL's unregulated operations in Antigua, BDO issued unqualified audit opinions on its Stanford Clients' annual financial statements even though BDO knew that its clients' operations were

*substantially* dependent — if not *entirely* dependent — upon the continuous sale of unregulated, fictitious SIBL CDs.  To illustrate BDO's audit failures in this regard, STC generated nearly 70% of its 2007 operating revenues through referral fees earned from SGC's sales of SIBL CDs.  The Louisiana Office of Financial Institutions ("OFI") was so alarmed by STC's dependence upon the sale of SIBL CDs that in July 2008, the OFI ordered STC to stop increasing the number or dollar volume of such products in its portfolio.

69.     SGC's fate also hinged on selling hundreds of millions of dollars in fictitious SIBL CDs.  Without the income from such sales, SGC would have been insolvent from at least 2004 forward, and likely before.  Nevertheless, with knowledge of its clients' dependence on SIBL CDs and Stanford Financial Group's improprieties, BDO continued to issue unqualified audit opinions on SGC's and STC's annual financial statements year after year.  In doing so, BDO enabled Stanford Financial Group to sell unregulated CDs protected by a safe haven that BDO purposefully helped to create.

### i.     Other Facts Showing BDO's Support of the Stanford Ponzi Scheme

70.     Other facts also illustrate BDO's active cooperation and support of the Stanford Ponzi scheme.  When Stanford Financial Group's counsel solicited international accounting firm KPMG to accept Stanford's two Caribbean airlines as new clients in April 2005, KPMG summarily rejected his proposal on risk-management grounds.  When responding to KPMG's due diligence requests, he informed KPMG that Stanford Financial Group's approximately 65 entities, including SIBL and its $4 billion in assets, were directly owned by a single person, Allen Stanford.  His subsequent offer to meet "off-the-record and informally" with KPMG's personnel and discuss the negative "rumor[s] and innuendo[s]" about his client apparently were not enough to persuade KPMG to accept Stanford Financial Group's airlines as clients.  In

contrast, BDO promptly accepted the two airlines as clients and audited their annual financial statements for at least 2001 through 2005.

71.     BDO's unqualified audit opinions for its Stanford Clients' annual financial statements, combined with BDO's service on the Stanford Task Force, its institutional knowledge of SIBL's unregulated operations in Antigua, its concealment of material information, its major audit failures, and its other suspicious acts, demonstrate that BDO was generally aware of Stanford Financial Group's improper activities, and that BDO assisted its Stanford Clients in the face of a perceived risk that its assistance would facilitate Stanford Financial Group's violations of the Texas Securities Act.   Furthermore, BDO's activities demonstrate that BDO was aware of Stanford Financial Group's breaches of fiduciary duties to Plaintiffs and both Classes, and that BDO was aware of its participation in those breaches of fiduciary duties.

**F.     BDO Failed in its Role as the Public Watchdog**

72.     As the United States Supreme Court stated in *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984), independent auditors serve as a public watchdog to protect the public's interests:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to investing public.  This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.

The *Arthur Young* opinion is clear that only *independent* accountants may bear this ultimate responsibility to a company's creditors, stockholders, and the investing public.  Independence is the gatekeeper.  Without it, accountants cannot even *serve* as a public watchdog.

73.     BDO utterly failed to fulfill its obligations as the public watchdog for Stanford Financial Group, and because of this failure, tens of thousands of innocent CD investors lost billions of dollars.  BDO issued unqualified audit opinions for Stanford Financial Group when it was explicitly prohibited from even *serving* as a public watchdog, and in doing so, BDO consciously circumvented the professional obligations of independence that it owed to Stanford Financial Group's innocent CD investors.  Moreover, in the years that BDO was not explicitly prohibited from serving as the public watchdog, the circumstances under which BDO issued its unqualified audit opinions demonstrate a conscious betrayal of the public trust.

74.     Stanford Financial Group, aided by BDO's services, issued approximately $7.2 billion in sham CDs to investors.  Shockingly, however, precious little of the CD investors' money ever made it to SIBL.  Instead, Stanford Financial Group diverted and distributed the investor funds among its various domestic entities, including SGC, and BDO's other Stanford Clients.  Despite the sheer size and volume of Stanford's simple shell game, BDO consciously failed to lift the veil on Stanford Financial Group's fictitious operations.

75.     BDO's cozy relationship with Stanford Financial Group was steeped in conflicts of interest and required ongoing deceptive and duplicitous manipulation of the facts to enable the Ponzi scheme's exponential growth for over a decade.  The result of this deception is the loss of thousands of investors' life savings.  While many of the so-called professionals that provided services to Stanford Financial Group were integral to the ongoing fraud, BDO's audit and other services for Stanford Financial Group's most critical businesses was the glue that held the scheme together.  If BDO had exercised even a minimum level of the independence, inquiry, and professional skepticism required of independent auditors, then it would have revealed the ongoing fraud many years ago.

## V.   PLAINTIFFS' AND CLASSES OF INVESTORS' CLAIMS

### A.   Basis for Claims

76.     Plaintiffs and all members of both Classes invested in the Stanford Ponzi scheme by purchasing SIBL CDs or placing their money in other depository accounts with SIBL.  Over the years that Plaintiffs and the Classes purchased and maintained investments in SIBL, Plaintiffs and the Classes were repeatedly and uniformly told, either directly by Stanford Financial Group's FAs or other employees or agents (who were uniformly trained to make these statements) or via Stanford Financial Group's promotional materials, that, *inter alia:*  (1) an investment in SIBL was safer than investing in U.S. banks because SIBL did not make loans but instead invested in a portfolio focused on safe and highly liquid instruments; (2) the assets held in SIBL's investment portfolio were more than sufficient to cover any and all CD liabilities; (3) SIBL was fully and adequately regulated by the Antiguan FSRC; and (4) that an investment in SIBL was completely safe and secure because it was guaranteed and insured by Lloyd's of London, was audited by an "outside" audit firm, and subjected to regular, "stringent" risk management examinations.  All of these representations were *false*.

77.     During the time that Plaintiffs and both Classes purchased and maintained investments in SIBL, Stanford Financial Group sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs and both Classes that, *inter alia:*  (1) SIBL was not regulated by the U.S. or any other government; (2) Plaintiffs' and the respective Classes' members' investments in SIBL were *not* insured; (3) no one knew where Stanford Financial Group was investing the investors' CDs or deposits or what assets comprised the SIBL portfolio; (4) Stanford Financial Group was operating illegally as an unregistered investment company (whose contracts were thus void under § 47 of the Investment Company Act) that was soliciting and selling unregistered securities by, from, and through Houston, Texas; (5) SIBL was not invested in safe, secure, and liquid instruments, but was either stealing its clients' money outright or investing it in

speculative Caribbean real estate ventures; (6) SIBL was not adequately regulated by the FSRC or any other entity and was audited by a one man "mom and pop" audit shop under the control of Allen Stanford; (7) Stanford Financial Group issued personal loans to Allen Stanford using the funds from Plaintiffs' and both Classes' members' investments in the SIBL CDs; and (8) Stanford Financial Group was being investigated by the SEC for possible securities fraud from 2005 until the U.S. government finally seized Stanford Financial Group's operations in February 2009.

78.     Based on the representations and omissions of material fact made to Plaintiffs and both Classes repeatedly and uniformly over the years — both in person by Stanford Financial Group's FAs, employees, or agents, and via the promotional materials created by Stanford Financial Group — Plaintiffs and the respective Classes' members decided to invest money in, and maintain investments in, the SIBL CDs.

79.     Plaintiff Philip Wilkinson invested a substantial portion of his retirement savings with SGC and STC in early June 2007.  At that time, Wilkinson met with an SGC investment adviser at the Houston office of SGC, who advised him of the safety and security of an investment in SIBL CDs.  Following Stanford Financial Group's indoctrinated script, the SGC advisor made several uniform and standardized misrepresentations to Wilkinson, including that: (1) SIBL was "safer than a U.S. Bank" because it had Lloyds of London bonded insurance; (2) SIBL was safe because it did not make loans like a regular bank; but instead (3) invested in a portfolio of highly liquid assets, such that the CDs could be redeemed on just a few days notice. Based on those and Stanford Financial Group's other uniform and standardized sales misrepresentations and omissions of material facts, Wilkinson decided to open an IRA account with STC (Account No. STSGC40958), and following the advice of his SGC investment adviser, Wilkinson decided to invest a substantial portion of his retirement savings, $500,000, into SIBL

CDs.  Wilkinson mailed his $500,000 check for the SIBL CDs directly to STC's bank, Hancock Bank, on June 13, 2007.

80.     In early 2007, Plaintiff Pam Reed and her husband, Bob Gibbins, were convinced by their Austin-based financial adviser to relocate their investments from Smith Barney to Stanford Financial Group when their financial adviser joined SGC.  In April 2007, after their financial adviser joined SGC, Gibbins and Reed moved their investment portfolio from Smith Barney to SGC.

81.     Gibbins's and Reed's FA then convinced them to invest their money in SIBL CDs.  On May 11, 2007, Gibbins and Reed invested $2,416,958.01 with SGC, and following the advice of their FA, purchased one SIBL "Fixed CD" in the amount of £160,104.07 (SIBL Account No. 304808) and another SIBL "Fixed CD" in the amount of $2,156,286.10 (SIBL Account No. 168069).  Both CDs were issued in the name of Gibbins and Reed jointly, and had a one-year term maturing in May 2008.

82.     In convincing Reed to buy the SIBL CDs, the FA told Reed (and Gibbins) that the SIBL CDs were low risk, liquid instruments like any regular U.S. bank CD, and that the SIBL CDs were insured by the FDIC and SIPC.  The FA also told Reed (and Gibbins) that *SIBL was part of SGC*, and that SGC was a licensed broker/dealer just like Smith Barney.

83.     In February 2008, before their CDs matured, the FA invited Gibbins and Reed to visit SIBL in Antigua.  Reed met with Allen Stanford and SIBL's President, Juan Rodriguez Tolentino, who provided Reed with a tour of SIBL and once again assured Reed that SIBL's CDs were an entirely safe and liquid product.

84.     Upon their return from Antigua, the FA sought to convince Gibbins and Reed to roll over and reinvest their SIBL CD proceeds into new SIBL CDs when the CDs matured in

May 2008.  During these discussions near the end of April or early May 2008, the FA:  (1) reaffirmed the safety, security, and low risk of the SIBL CDs; (2) reiterated that the SIBL CDs were insured against loss; and (3) represented that the SIBL CDs were completely backed by SIBL's assets, which had been audited by an international audit firm.

85.     In May 2008, as a result of their FA's misrepresentations about the safety and low risk of the SIBL CDs, Gibbins and Reed rolled over and reinvested the proceeds from their maturing SIBL CDs to purchase new SIBL CDs.  The new SIBL CDs were also issued in their names jointly, and Reed invested an additional $300,000 into SIBL CDs.

**B.     Class Action Allegations**

86.     Plaintiffs and the First Class (defined below), and if necessary, the Second Class (defined below), request this case be certified as a class action pursuant to FED. R. CIV. P. 23. The number of affected investors are so numerous that joinder of all members is impracticable. For example, the Texas-resident members of both Classes alone number 1,300 investors and account for $581 million in investment losses.  There are common questions of law and fact that are common to the members of the First Class, and common questions of law and fact that are common to the members of the Second Class, and these common questions predominate over individual issues.  The named Plaintiffs' claims are typical of both Classes' claims.  The named Plaintiffs have no interest adverse to the interests of other members of the two Classes.  The named Plaintiffs will fairly and adequately protect both Classes' interests.  The named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international securities litigation.

87.     Pursuant to FED. R. CIV. P. 23(a) and (b)(3), the Court should certify the First Class (defined below) and, if necessary, the Second Class (defined below).

a.      The Court should certify a class of all investors (the "First Class") who, as of February 17, 2009, had purchased and still held SIBL CDs and/or otherwise maintained deposit accounts with SIBL, excluding:  (1) BDO, its employees and agents; and (2) any officer, director, employee, or promoter of Stanford Financial Group, including SIBL, SGC, SFIS, or STC, as those entities have been defined herein.

b.      If necessary, the Court should also certify a class of investors (the "Second Class") who were clients or customers of SGC, STC, or SFIS, and as of February 17, 2009, had purchased and still held SIBL CDs and/or otherwise maintained deposit accounts with SIBL, excluding:  (1) BDO, its employees and agents; and (2) any officer, director, employee, or promoter of Stanford Financial Group, including SIBL, SGC, SFIS, or STC, as those entities have been defined herein.

88.      The court should certify the First Class, and if necessary, the Second Class, pursuant to FED. R. CIV. P. 23(b)(3) because questions of law or fact common to the members of both Classes predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Indeed, this is a case of "fraud created the market" and fraud on the regulators because Stanford's Ponzi scheme could not have existed or flourished were it not for the fraud that the Stanford Financial Group committed on regulators around the world and the fraud that the Stanford Financial Group committed by misleading investors regarding their investments in SIBL CDs or deposits with SIBL.  Named Plaintiffs and both Classes relied on the integrity of the market in deciding to invest in SIBL CDs.  Many investors who are class members have amounts invested that are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## C.    Discovery Rule/Inquiry Notice

89.    The SEC filed an action against Allen Stanford and SIBL *et al*. on February 17, 2009, and on or about that same day the Court appointed the Receiver.  Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial Group, SIBL, SGC, STC, or BDO until after that date. Moreover, the wrongful acts and conspiracy by BDO was inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to BDO's role in Stanford's fraud until now.

## VI.   CAUSES OF ACTION FOR PLAINTIFFS AND BOTH CLASSES

**(The Following Causes of Action are Plead on Behalf of
the Named Plaintiffs Individually, and on Behalf of Both Classes)**

**COUNT 1:    Aiding and Abetting Violations of the Texas Securities Act**

A. SALES OF UNREGISTERED SECURITIES

90.    BDO is liable as an "aider" for sales of unregistered securities to Plaintiffs and both Classes.  In particular, by its actions described herein, BDO provided substantial assistance to Stanford Financial Group, including SGC, STC, and SIBL, and made it possible for Stanford Financial Group to effectuate the sale of SIBL CDs to Plaintiffs and members of both Classes, and materially aided Stanford Financial Group to sell unregistered securities to Plaintiffs and members of both Classes from and through Texas.  The SIBL CDs offered and sold by Stanford Financial Group and SIBL, with BDO's participation, constitute "securities" under the relevant securities law jurisprudence, primarily the *Reves* test, precisely because the SIBL CDs were not insured by the FDIC, nor guaranteed by any similar government regulatory insurance regime. By assisting Stanford Financial Group's sales of these securities products, BDO acted recklessly and knew or should have known, and was willfully blind to the fact that said sales were illegal.

But for BDO's participation, Stanford Financial Group could not have sold unregistered securities to Plaintiffs and both Classes' members from and through Texas.

91.     BDO was generally aware that it was assisting in the sale of unregistered securities from and through Texas.  BDO knew that Stanford Financial Group and SGC were based in Texas, that the primary purpose of SGC was to sell the SIBL CDs, and that the primary purpose behind STC, which was controlled by SGC in Texas, was its use by SGC as a vehicle to get IRA accounts invested in SIBL CDs.  Furthermore, BDO knew that the entire purpose of every entity within the Stanford Financial Group of companies was to market, promote, and/or sell the SIBL CDs.  BDO also knew that SIBL did not function as a regular bank making loans, but rather invested the CD proceeds in a private investment portfolio.  Furthermore, BDO knew that the SIBL CDs had not been registered as securities with the SEC or Texas State Securities Board, because BDO reviewed the SIBL offering and disclosure statements and knew that SIBL had filed for a limited Reg. D exemption for certain "accredited" U.S. investors only.  Based on its knowledge of the Stanford Task Force and SIBL, the size of the CD offerings made by SGC, what SIBL was allegedly doing with investors' money, and Stanford Financial Group's operations, BDO also knew that the Reg. D exemption did not apply and that Stanford Financial Group was operating as an unregistered hedge fund in violation of the Investment Company Act, selling unregistered investment company securities.

92.     In assisting a Houston-based enterprise in the sale of unregistered securities, BDO was subjectively conscious of and willfully blind to a risk of illegality, and BDO assisted its Stanford Clients in the face of a perceived risk that its assistance would facilitate Stanford Financial Group's violations of the Texas Securities Act.  None of the SIBL CDs sold to Plaintiffs and both Classes were ever registered with the Texas State Securities Board and

therefore were sold to Plaintiffs and both Classes as unregistered securities in violation of the Texas Securities Act.  In assisting Stanford Financial Group, including SGC, STC, and SIBL, to effectuate the sale of the unregistered securities from and through Texas, BDO acted intentionally or with reckless disregard for the truth and the law.  As a result of BDO's conduct in materially aiding SGC, STC, and SIBL to sell unregistered securities from and through Texas, Plaintiffs and both Classes have lost their investments and are entitled to the statutory remedy of rescission.  In the alternative, BDO's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs and both Classes, measured as the difference between their investments as stated in their last account statements and the amounts that Plaintiffs and both Classes may receive from the receivership distribution.

93.     Moreover, and despite SGC's, STC's, and SIBL's scheme to evade compliance with the Texas Securities Act by claiming a Reg. D exemption, the global offering of CDs by Houston-based Stanford Financial Group to "accredited" U.S. investors was in fact an unregistered public offering made in violation of Article 581 of the Texas Securities Act.  It was an integrated offering under Texas securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a.      The integrated offering involved general solicitation.  This general solicitation by Stanford Financial Group through SGC, STC, SFIS, and its U.S. affiliates, agents and brokers, as well as through foreign financial advisors, included general public advertisements, publicly distributed magazine articles, television and other communications, and media published in print in Houston, Texas and distributed broadly

for general distribution in the United States and abroad to offerees and purchasers of the CDs.

b.      The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas, Louisiana and Florida, of Stanford Financial Group's products, including the SIBL CDs.

c.      The integrated offering involved seminars and meetings conducted in the United States (including Texas, Louisiana, and Florida), Mexico, and Venezuela and elsewhere in Latin America.  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

d.      The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in the billions of dollars, far in excess of that disclosed to the SEC in SIBL's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas, Louisiana, and Florida residents or those otherwise subject to Texas, Louisiana, or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial Group and/or SFIS.

e.      The aggregate size of the sales of SIBL CDs during this period was approximately $7.2 billion.  The aggregate size of the sales in the United States during this period was in excess of $2.2 billion.  The number of investors purchasing the SIBL CDs in the U.S. under the Reg. D filing was far in excess of 1,000, and over 1,000 IRA accounts at STC were invested in the SIBL CDs.

f.      The offering was made to investors with whom Stanford Financial Group, including SGC, had no pre-existing relationship, through brokers or affiliates of Stanford

Financial Group who were paid substantial and excessive undisclosed commissions in connection with the SIBL CDs.

g.      The offering was made to U.S. citizens who did not qualify as "accredited investors," and far more than 35 persons who did not qualify as "accredited investors" purchased the SIBL CDs; indeed the vast majority, at least $5 billion of the CDs, were sold to foreign citizens that did not qualify as "accredited investors," and many of these foreign citizens purchased the SIBL CDs from registered representatives of a broker/dealer who effected the transactions through the offices of Stanford Financial Group and SFIS in Miami, Florida, Houston, Texas, and San Antonio, Texas.

B. SALES OF SECURITIES BY UNREGISTERED DEALERS

94.     BDO aided and abetted SIBL, SGC, STC, and Stanford Financial Group generally in the sale of securities to Plaintiffs and both Classes from and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.  Specifically, and as alleged herein, BDO knew or should have known that the global conglomeration of entities known collectively as "Stanford Financial Group" was acting as a hedge fund without being registered as such under the Investment Company Act, and that the hedge fund was illegally disguising itself as a bank (SIBL) and issuing hedge fund shares, disguised as CDs, to the general public from, by and through Texas and then Stanford Financial Group pooled its customers' money together to make illiquid, speculative investments. The Stanford Financial Group "fund" made these sales without registering with the Texas State Securities Board as a dealer under Section 12(A).

95.     BDO intentionally and actively aided and abetted the Stanford Financial Group "fund" to sell securities from and through Texas, by means of the conduct described herein. With

full knowledge or willful blindness to the fact that Stanford Financial Group was, directly or through its web of companies, including SIBL, acting as an unregistered investment company "fund" in Texas selling "fund" securities from and through Texas, and that Stanford Financial Group, including SIBL, was being operated and "run" from Texas, BDO aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial Group's, SGC's, and SIBL's violations of the Texas Securities Act by continuing to provide the services described herein to help effectuate sales of the worthless CDs and fund the Ponzi scheme.

96.    BDO was generally aware of and willfully blind to the fact that it was assisting the sales by an unregistered "fund" of unregistered "fund" securities from and through Texas.  In assisting the sale of unregistered "fund" securities through a Houston-based enterprise, BDO was subjectively conscious of a risk of illegality, and BDO assisted its Stanford Clients in the face of a perceived risk that its assistance would facilitate Stanford Financial Group's violations of the Texas Securities Act.  In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, BDO acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  As a result of BDO's conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs and both Classes have lost their investments and are entitled to the statutory remedy of rescission.  In the alternative, BDO's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs and both Classes, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs and both Classes may receive from the receivership distribution.

C.     UNTRUTH OR OMISSION

97.     BDO, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial Group, including SGC, STC, and SIBL and their principals, in the sale of uncovered securities (the SIBL CDs) through the use of untrue representations or materially misleading omissions, and also aided and abetted the fraudulent practices of registered investment advisers in violation of the Texas Securities Act.  In particular, and as set forth in the Davis Plea, Stanford Financial Group was a massive Ponzi scheme that was perpetuated by the continued sales of SIBL CDs to unsuspecting investors like Plaintiffs and both Classes.  Stanford Financial Group led Plaintiffs and both Classes, verbally and through written marketing materials prepared and disseminated via Stanford Financial Group's Houston office, to believe that their money was being invested in safe, liquid investments that were insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and used to finance Stanford Financial Group's principals' lavish lifestyles and to invest in long-term, illiquid and high-risk investments including real estate development projects in Antigua and elsewhere in the Caribbean.   Moreover, Stanford Financial Group omitted to inform Plaintiffs and both Classes that it was selling them unregistered securities, that it was operating as an unregistered, uninsured, illegal investment company "fund" in violation of the Investment Company Act and the Texas Securities Act, and that it was being investigated by the SEC for possible securities fraud from 2005 until the U.S. government finally seized Stanford Financial Group's operations in February 2009.

98.     BDO was generally aware of and willfully blind to the fact that it was involved in improper activity and that it was assisting the sale of unregistered securities from and through

Texas.  With knowledge that SGC and STC were misleading investors about the nature and risk of investments in related-party bank SIBL, and with reckless disregard for the truth and the law, BDO provided substantial assistance to Stanford Financial Group, including SGC, STC, and SIBL, in effecting over $7.2 billion worth of SIBL CD purchase transactions as described herein, and thereby materially aided the Stanford Financial Group entities' sales of securities through the use of untruths and materially misleading omissions.  BDO was subjectively aware of, and absolutely indifferent to, the risk posed by its conduct.  In assisting the sale of unregistered securities through a Houston-based enterprise, BDO was subjectively conscious of a risk of illegality, and BDO assisted its Stanford Clients in the face of a perceived risk that its assistance would facilitate Stanford Financial Group's violations of the Texas Securities Act.  In short, BDO's actions as described herein allowed Stanford Financial Group, including SGC, STC, and SIBL, to continue to sell securities to Plaintiffs and both Classes from and through Texas using untruths and materially misleading omissions.

99.     As a result of BDO's conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs and both Classes have lost their investments and are entitled to the statutory remedy of rescission.  In the alternative, BDO's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs and both Classes, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs and both Classes may receive from the receivership distribution.

### D. CO-CONSPIRATOR LIABILITY

100.     BDO is jointly and severally liable as a co-conspirator for Stanford Financial Group's, including SGC's, STC's, and SIBL's, primary violations of the Texas Securities Act.

In particular, BDO knowingly conspired and combined together with others at Stanford Financial Group to assist Stanford Financial Group to sell unregistered securities to Plaintiffs and both Classes using untrue representations or materially misleading omissions, as described herein. BDO took various overt acts designed to assist Stanford Financial Group to accomplish the goal of selling CDs from and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas.  BDO's conspiracy with Stanford Financial Group to violate the Texas Securities Act is a proximate cause of rescission and/or actual damages to Plaintiffs and both Classes, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs and both Classes may receive from the Receivership distribution.

**COUNT 2:     Participation in/Aiding and Abetting Breach of Fiduciary Duty**

101.    As a registered investment adviser, SGC owed a fiduciary duty to Plaintiffs and both Classes as a matter of law.  As a fiduciary trust company holding IRA accounts, STC also owed fiduciary duties to Plaintiff Philip Wilkinson and the Second Class.  As a fiduciary trust company or representative of a fiduciary trust company, SFIS also owed fiduciary duties to Plaintiffs and both Classes.

102.    SGC, STC, and SFIS breached their respective fiduciary duties to Plaintiffs and both Classes by advising them to invest their money in the SIBL CDs, because such investments were entirely imprudent and unsuitable for any investor and because SGC, STC, and SFIS were financially incentivized to recommend the related-party SIBL CDs above other investment products.  SGC, STC, and SFIS did not have the basic financial information regarding the SIBL CD investments necessary to make such investment recommendations to Plaintiffs and both Classes, but instead made the recommendations to purchase the SIBL CDs based on the huge, above-market commissions that SGC, STC, and SFIS were paid by SIBL to promote the CDs.

103. BDO knew that SGC, STC, and SFIS owed fiduciary duties to Plaintiffs and both Classes, and BDO was aware that SGC, STC, and SFIS were breaching these fiduciary duties, as described herein. BDO was also aware that it was aiding, abetting, and otherwise participating in SGC's, STC's, and SFIS's breaches of those duties by the conduct alleged herein. The breaches of fiduciary duties by SGC, STC, and SFIS, and BDO's awareness of its participation in such breaches, were a proximate cause of actual damages to Plaintiffs and both Classes. BDO knew or should have known that its aiding, abetting, and participation in the breaches of fiduciary duties set out above likely would result in extraordinary harm to Plaintiffs and both Classes. Accordingly, Plaintiffs and both Classes are entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this court.

**COUNT 3:** **AIDING AND ABETTING/PARTICIPATION IN A FRAUDULENT SCHEME**

104. By its conduct described herein, BDO aided, abetted, and participated with Stanford Financial Group, including SGC, STC, and SFIS, in a fraudulent scheme, making BDO directly liable for fraud. In particular, BDO assisted and enabled Stanford Financial Group, including SGC, STC, and SFIS, in its sales of SIBL CDs to Plaintiffs and both Classes through its services for SIBL, including the Stanford Task Force, and issuing unqualified audit opinions on SGC's and STC's annual financial statements. Such actions by BDO in combination with Stanford Financial Group are a proximate cause of actual damages to Plaintiffs and both Classes, measured as the difference between their investments in Stanford Financial Group as stated in their last account statements and the amounts that Plaintiffs and both Classes may receive from the Receivership distribution.

**COUNT 4:** **CIVIL CONSPIRACY**

105. BDO conspired with other employees and agents of Stanford Financial Group, including SGC, STC, SFIS, and SIBL, to commit the wrongful conduct described herein,

including breach of fiduciary duty, violations of the Texas Securities Act, and fraud.  BDO is responsible for all wrongdoing done by each and the other members of the conspiracy, including Allen Stanford, Jim Davis, Mauricio Alvarado, SIBL's president Juan Rodriguez Tolentino, SGC's president Danny Bogar, Leroy King, and others, in furtherance of the unlawful conspiracy and enterprise.

106.    Together with other employees and agents of Stanford Financial Group, including SGC, STC, SFIS, and SIBL, BDO joined in a conspiracy (which began in 1997 and continued to February 2009) to assist Stanford Financial Group in its sales of SIBL CDs, including SGC's and SFIS's sales of SIBL CDs and STC's custody of such CDs, purchased and held by Plaintiffs and both Classes, and to help Stanford Financial Group hide its activities from regulatory scrutiny.  The central object of the ongoing conspiracy was to enable Stanford Financial Group's sales of the SIBL CDs, including SGC's and SFIS's sales of SIBL CDs and STC's custody of such CDs, purchased by Plaintiffs and both Classes.  There was a meeting of the minds at various times described herein as the various members of the conspiracy joined the conspiracy, as to the central objective described above, and a meeting of the minds between BDO and others as to the means for executing the scheme.

107.    During all relevant times, BDO, in furtherance of the conspiracy and/or aiding or abetting the employees and agents of Stanford Financial Group, including SGC, STC, SFIS, and SIBL, in furtherance of the common enterprise, engaged in specific overt acts as described herein.  BDO's conduct was part of a continuing activity that was essential to, and therefore in furtherance of, the survival of the Stanford Ponzi scheme, which was an ongoing operation as to SIBL and SGC when BDO joined the conspiracy in 1997, and an ongoing operation as to STC and SFIS beginning in 1998.  The conspirators' concealment and frustration of investigatory

efforts by the SEC, the Louisiana OFI, and/or other regulatory agencies in a highly regulated environment such as securities was central to the success and longevity of the overall Stanford Ponzi scheme conspiracy.  The Stanford Ponzi scheme proximately caused Plaintiffs and both Classes to lose their investments, and BDO, by joining in conduct designed to assist and facilitate Stanford Financial Group's illicit conduct, is jointly and severally liable with Stanford Financial Group, including SGC, STC, SFIS, and SIBL, for all of Plaintiffs' and both Classes' losses.

## VII.   JOINT ENTERPRISE/SINGLE BUSINESS ENTERPRISE

108.   A joint enterprise or single business enterprise (at least for jurisdictional purposes) existed between BDO International and the various Member Firms within BDO International that provided services to Stanford Financial Group.  BDO International and the various Member Firms within BDO International operate as a joint enterprise or single business enterprise.  All the Member Firms within BDO International centrally report and share resources and allocate costs across business segments as opposed to individual Member Firm lines.  There was an express or implied agreement between BDO International, the Member Firms within BDO International, and their respective principals concerning the establishment and administration of the joint enterprise/single business enterprise; a common purpose to be carried out by these various entities and their respective principals, including reaping fees and profits from the illicit activities of the joint enterprise/single business enterprise; a community of pecuniary interest among these various entities and their respective principals; and sharing in the management and direction of the joint enterprise/single business enterprise by these various entities and their respective principals.  Indeed, BDO USA's engagement letters with Stanford Financial Group state that BDO USA may assign its rights to perform services for Stanford Financial Group to any of BDO International's Member Firms *without* Stanford Financial

Group's prior consent.  Moreover, BDO International's Member Firms in the United States, Ecuador, Peru, Mexico, and Spain worked in concert and under the control of BDO International and BDO USA to provide audit, tax, consulting, or other professional services to Stanford Financial Group.  Thus, a joint enterprise or single business enterprise existed between and among BDO International, the Member Firms within BDO International, and their respective principals.  Therefore, BDO International, the Member Firms within BDO International, and their respective principals are jointly and severally liable for the fraudulent acts described herein.

## VIII.   ALTER EGO

109.    BDO International is directly liable for the acts and omissions of BDO USA as described herein because BDO USA is the alter ego of BDO International, and a conduit through which BDO International conducted its business, including participation in the Stanford Ponzi Schemes as described herein.  Specifically, BDO International owns, controls, and/or dominates BDO USA to such an extent that BDO USA has no separate interests of its own and in reality functions as a mere division, instrumentality, or branch of BDO International.  Indeed, BDO International and all its Member Firms, including BDO USA, operate as a single, unified worldwide business unit or single business enterprise, all operating under the BDO International brand, international trademark, trade name, and logo.  BDO International controls the manner in which its Member Firms, such as BDO USA, are perceived by the public, including controlling the Member Firms' use of the BDO International brand name, and therefore BDO International intentionally creates the impression in the minds of third parties that BDO International is one unified, global entity that acts as a single unit.

110.    BDO International's own website touts BDO's unified, global services, including BDO's:  (i) "seamless service worldwide;" (ii) "continued [efforts] to build [its] international capabilities;" (iii) provision of services "to [BDO] clients in 119 countries;" (iv) "establish[ment]

[of] a worldwide structure" in 1988, and consistent use of the BDO acronym for each Member Firm, which "together with the introduction of a new logo and a consistent global brand, clearly demonstrate[s] that the local expertise of [BDO International's Member Firms] [is] combined with the international expertise and strength of [BDO's] international network;" (v) "move to a single global trading name" of "simply BDO" in 2009 to "demonstrate[] [BDO's] commitment to service [its] clients and to compete successfully in [its] market on a multinational basis;" (vi) "easily shared [expertise] across [BDO's] network;" and (vii) "ambition to significantly increase our market share and *ensure that we are recognised in the market as a unified global network*." As part of its global branding strategy, BDO International and the Member Firms within BDO International operate as a single economic unit.  For all effective purposes, and certainly for purposes of this lawsuit, BDO International and the Member Firms within BDO International are one and the same because that is the perception that BDO International seeks to create in the minds of third parties worldwide, including Plaintiffs and the Classes.

111.   Furthermore, the entities comprising the Stanford Financial Group of companies, including but not limited to SGC, STC, SFIS, SIBL, Stanford Group Ecuador, Stanford Group Mexico, and Stanford Group Peru, all acted as the alter ego of each other and of Allen Stanford, and Plaintiffs hereby adopt the alter ego arguments made by the U.S. Receiver, Ralph S. Janvey, in his Response to the Antiguan Liquidators' December 3, 2009 Supplemental Brief, in the related case pending before this Court styled *In re Stanford International Bank Ltd., C.A.* No. 3-09-CV-0721-N (docket #61) at pp. 11-16.

## IX.   RESPONDEAT SUPERIOR

112.   BDO is liable for the tortious and negligent acts of its principals, partners, employees, and agents, including without limitation, Carlos Ancira.  Ancira was acting within

the course and scope of his partnership and employment with BDO, and in furtherance of BDO's business, when he engaged in the wrongful conduct described herein.

## X.  ACTUAL DAMAGES

113.    Plaintiffs and the First Class have suffered the loss of at least $7.2 billion that was proximately caused by the wrongful conduct of BDO as described herein.  Plaintiffs and the Second Class have suffered the loss of approximately $3.5 billion that was proximately caused by the wrongful conduct of BDO as described herein.  BDO is jointly and severally liable to Plaintiffs and both Classes for the injuries caused by the Stanford Financial Group, including SGC, STC, SFIS, and SIBL, under Texas common law of joint and several liability, as well as under the Texas Securities Act.

## XI.  PUNITIVE DAMAGES

114.    The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of Tex. Civ. Prac. & Rem. Code §41.003. Plaintiffs and both Classes are entitled to recover punitive damages in an amount necessary to punish BDO and to deter similar conduct of others in the future.

## XII.  ATTORNEYS FEES

115.    Plaintiffs and both Classes are entitled to recover reasonable attorneys' fees and costs under the Texas Securities Act.  *See* Tex. Rev. Civ. Stat. Ann. Art. 581-33D(6), (7).

116.    Plaintiffs and both Classes are also entitled to recover reasonable attorneys' fees under the common-fund doctrine.  *See City of Dallas v. Arnett*, 762 S.W.2d 942, 953 (Tex. App.—Dallas 1988, writ denied).

## XIII.  CONDITIONS PRECEDENT

117.    All conditions precedent to filing this Complaint have been met.

## XIV.   JURY DEMAND

118.    Plaintiffs demand a trial by jury.

## XV.   PRAYER

119.    Plaintiffs request that BDO be summoned to answer this Complaint, that this action be certified as a class action for the First Class's claims, or if necessary, that this case also be certified as a class action for the Second Class's claims, that the case be tried before a jury, and that upon final judgment, Plaintiffs and either the First Class or both Classes recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs and both Classes pray for such other and further relief to which they may be justly entitled.

Dated:  May 26, 2011

Respectfully submitted,

**HOHMANN, TAUBE & SUMMERS, L.L.P.**

By:   */s/  Guy M. Hohmann*
     Guy M. Hohmann
     State Bar No. 09813100
     guyh@hts-law.com
     T. Wade Jefferies
     State Bar No. 00790962
     wadej@hts-law.com
     Christopher W. Ahart
     State Bar No. 24036115
     chrisa@hts-law.com
     100 Congress Avenue, 18th Floor
     Austin, Texas 78701
     Telephone:  (512) 472-5997
     Telecopier:  (512) 472-5248

*LEAD CLASS COUNSEL AND*
*ATTORNEYS IN CHARGE FOR PLAINTIFFS*
*AND THE PUTATIVE CLASSES*

**CASTILLO SNYDER, P.C.**

By:   */s/  Edward C. Snyder*
     Edward C. Snyder
     esnyder@casnlaw.com
     Jesse R. Castillo
     jcastillo@casnlaw.com
     300 Convent Street, Suite 1020
     San Antonio, Texas  78205
     (210) 630-4200
     (210) 630-4210 (Facsimile)

*CLASS COUNSEL FOR PLAINTIFFS AND*
*THE PUTATIVE CLASSES*